JS 44 (Rev. 12/12)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)

**PLAINTIFFS**

Vanessa Royce
638 Charles Drive
Gilbertsville, PA 19525

**DEFENDANTS**

The Pennsylvania Cyber Charter School
652 Midland Avenue
Midland, PA 15059

**(b)** County of Residence of First Listed Plaintiff ___Montgomery County, PA___
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jana R. Barnett, Esquire (Pa.S.Ct. I.D. 73189)
Law Offices of Jana R. Barnett
1238 Cleveland Avenue
Wyomissing, PA 19610-2102
610/478-1860

Attorneys *(If Known)*
Christine E. Reilly, Esquire
Latsha Davis & McKenna
350 Eagleville Boulevard, Suite 100
Exton, PA 19341

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | X 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 340 Marine | Liability | | | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | X 442 Employment | ☐ 510 Motions to Vacate | | 26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | ☐ 446 Amer. w/Disabilities Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

X 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.

Brief description of cause: Employment discrimination based on gender (sexual harassment) and retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ Unspecified in excess of $150,000

CHECK YES only if demanded in complaint:

JURY DEMAND: X Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE June 6, 2015    SIGNATURE OF ATTORNEY OF RECORD

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 638 Charles Drive, Gilbertsville, PA 19525

Address of Defendant: 652 Midland Avenue, Midland, PA 15059

Place of Accident, Incident or Transaction: Mainly Defendant's Offices in Lehigh and Philadelphia Counties; Plaintiff received telephone calls at her home in Montgomery County

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))                                  Yes☐   No X

Does this case involve multidistrict litigation possibilities?                                                               Yes☐   No X
*RELATED CASE, IF ANY:*
Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:
1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                                                                                                                             Yes☐   No X
2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
                                                                                                                             Yes☐   No X
3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
                                                                                                                             Yes☐   No X
4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
                                                                                                                             Yes☐   No X

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. X Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
      (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
      (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Jana R. Barnett, Esquire, counsel of record do hereby certify:
   X  Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
   X  Relief other than monetary damages is sought.

DATE: June 6, 2015          _____          73189
                            Jana R. Barnett, Attorney-at-Law   Attorney I.D.#

          **NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: June 6, 2015          _____          73189
                            Jana R. Barnett, Attorney-at-Law   Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Vanessa Royce, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| The Pennsylvania Cyber Charter School, | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.     ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.     ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.     ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)     ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.     ( X )

| | | |
|---|---|---|
| June 6, 2015 | Jana R. Barnett | Plaintiff Vanessa Royce |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 610/478-1860 | 610/478-0453 | JRB@JanaRBarnettEsq.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Vanessa Royce** | : | **Civil Action** |
| **638 Charles Drive** | : | |
| **Gilbertsville, PA 19525,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **No. 15-**_____ |
| ***v.*** | : | |
| | : | **Assigned to:** _____ |
| **The Pennsylvania Cyber Charter School,** | : | |
| **652 Midland Avenue** | : | |
| **Midland, PA 15059,** | : | |
| | : | |
| **Defendant** | : | **Jury Trial Demanded** |

## COMPLAINT

Vanessa Royce, Plaintiff, by her attorney, Jana R. Barnett, Esq., alleges as follows:

## I.   INTRODUCTION

1. This is an action seeking redress for discrimination based on sex (sexual harassment) and retaliation, in contravention of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e, *et seq*.

2. Vanessa Royce, a female citizen of the United States, seeks equitable and monetary relief for the unlawful actions of The Pennsylvania Cyber Charter School, including back pay and benefits, front pay and benefits, compensation for physical and emotional pain and suffering, reimbursement of expenses, costs, attorney's fees, punitive damages, and all other relief to which she is entitled by law.

## II.   JURISDICTION AND VENUE

3. This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. §1331, and 42 U.S.C. §2000e *et seq*. (§706).

4. Venue in this district is appropriate pursuant to 28 U.S.C. §1391(b). The unlawful acts and practices of The Pennsylvania Cyber Charter School were committed by the

Defendant within the Eastern District of Pennsylvania, primarily in its offices in
Philadelphia and Lehigh Counties.

### III.   **PARTIES**

5. Plaintiff Vanessa Royce is an adult citizen of the Commonwealth of Pennsylvania who
   resides in Montgomery County, Pennsylvania.  Her address is 638 Charles Drive,
   Gilbertsville, PA 19525.

6. Defendant The Pennsylvania Cyber Charter School ("PA Cyber") is headquartered at 652
   Midland Avenue, Midland, PA 15059.  It employed Ms. Royce.  It has offices in Lehigh
   and Philadelphia Counties, and Ms. Royce worked in both of those offices.  It is an
   employer within the meaning of Title VII.

### IV.   **FACTUAL BACKGROUND**

7. Ms. Royce began working for PA Cyber as a substitute teacher on or about February 15,
   2010.

8. In or about March 2010, Ms. Royce because a fulltime Instructional Supervisor in the
   Philadelphia office.

9. In or around January 2012, PA Cyber transferred James Vendemia and his wife, Renee,
   to its Philadelphia Office.  Mr. Vendemia was the Principal, Eastern Support Center.  His
   wife was an Instructional Supervisor.

10. PA Cyber knew that Mr. Vendemia had engaged in inappropriate conduct while working
    for PA Cyber and before his transfer to the Philadelphia Office.

11. Ms. Royce reported to Mr. Vendemia from approximately January 2012 through October
    15, 2012.

12. As the Principal, Mr. Vendemia was responsible for the entire Philadelphia office.
    Among other things, Mr. Vendemia participated in all of the employee performance
    reviews; helped to create employee improvement plans; decided when staff could take
    time off; and reprimanded staff whom he perceived as having too many students with
    academic or behavioral concerns.

13. Mr. Vendemia reported to Academy Leader Eric Woelfel.

14. Mr. Vendemia took a particular interest in Ms. Royce soon after he began working in

Philadelphia, and asked her to work with him, more and more.

15. PA Cyber's Policy 703 required that, "Any and all complaints of harassment shall be immediately reported to the immediate supervisor or to Human Resources without fear of reprisal."

16. In January 2012, Ms. Royce complained about Mr. Vendemia's behavior toward her to her immediate supervisor, Carla Krochak (Team Captain / Instructional Supervisor). Ms. Royce notified Ms. Krochak that she felt that Mr. Vendemia was paying extra attention to her, and that his demeanor and approach made her uncomfortable. Ms. Royce described it as a "weird feeling".

17. Beginning in February 2012, Mr. Vendemia initiated inappropriate communications with Ms. Royce at least once or twice a week. His communications were conversations in person and on the telephone, as well as text messages and emails. He would communicate with her before, during, and after, normal work hours. Mr. Vendemia commented on Ms. Royce's appearance. He stated how lucky her husband was to be with her. He interrupted her time with her husband, calling her from bars in the evenings, and telling her that he was out "getting toasted" with friends. He would tell Ms. Royce that he had left his wife at home.

18. His inappropriate behavior and communications became more frequent.

19. Because Mr. Vendemia commented on Ms. Royce's appearance so often, Ms. Royce felt that Mr. Vendemia took an interest in her, and was "helping" her, because he was physically attracted to her. Mr. Vendemia seemed to undress her with his eyes. He positioned himself so that he was close to her, physically. He made eye contact with her more often than with other employees.

20. Mr. Vendemia's attentions to Ms. Royce were so noticeable that coworkers called Ms. Royce Mr. Vendemia's "pet".

21. Mr. Vendemia's comments about Ms. Royce's clothing and appearance did not serve any business purpose. They had the effect of making her feel self-conscious and concerned that Mr. Vendemia would make more explicit sexual advances. His comments made her feel like an object. She felt uncomfortable in her clothing, as though she were naked. Ms. Royce wondered whether Mr. Vendemia was looking at the shirt, or looking through it and imagining what was underneath. Ms. Royce felt as though she were under a

-3-

microscope.

22. Ms. Royce changed her style of work clothing in the hopes that the unwanted attention from Mr. Vendemia would cease.

23. Mr. Vendemia's comments interfered with Ms. Royce's ability to perform her job. Among other things, she changed from a "walk-around manager" to someone who hid in her office. She became more subdued in her communications with her staff.

24. Mr. Vendemia's comments about her clothing and appearance, his interest in her, his telephone calls to her home, his undressing her with his eyes, his eye contact, etc. were unwelcome.

25. During the week of February 22, 2012, Ms. Royce made a second complaint about Mr. Vendemia to her immediate supervisor. Ms. Royce informed Ms. Krochak that Mr. Vendemia sent her inappropriate text messages, that he spoke to her in inappropriate ways, that he had been contacting her outside of normal work hours on many occasions, and that she was uncomfortable with his attentions. Ms. Royce also informed Ms. Krochak that her husband was very upset and that their marriage was suffering. Ms. Royce told Ms. Krochak that she felt overwhelmed by the amount of work that Mr. Vendemia wanted her to do, but believed that she had to do it or would face repercussions.

26. On February 25, 2012, Ms. Krochak sent Ms. Royce an email confirming that Ms. Royce had shared information with her, that she had documented the conversation, and that Ms. Krochak had advised Ms. Royce to go to Human Resources.

27. Ms. Krochak did not report the sexual harassment to Human Resources or PA Cyber's management.

28. Although Ms. Royce did not use words to tell Mr. Vendemia that his attentions were unwelcome, she communicated this message to him in a variety of ways, including changing her interactions with him. Ms. Royce steered clear of Mr. Vendemia. She sat as far away from him as possible when they were in the same room. She tried to look busy. She remained on the telephone longer than necessary to avoid being called into meetings. Her facial expressions and body language indicated that she wanted to be as far away from him as possible.

29. Ms. Royce told colleagues that Mr. Vendemia's attentions were unwanted. She showed

some of Mr. Vendemia's text messages to a male co-worker, and told the co-worker that the messages made her uncomfortable. The co-worker replied by saying that he didn't believe that speaking up would help.

30. A female co-worker told Ms. Royce that she also had been receiving text messages and after-hours telephone calls from Mr. Vendemia; and that Mr. Vendemia's text messages and after-hours calls made her feel uncomfortable, but that she didn't feel she could do anything to stop it because Mr. Vendemia was her boss.

31. Mr. Vendemia sent Ms. Royce text messages and emails telling her to "stick with him" or "stick with him and [she'd] go places".

32. Demonstrating his power to help Ms. Royce, Mr. Vendemia and Academy Leader Eric Woelfel gave Ms. Royce a "heads up" that the position of Team Captain would be opening up. Mr. Vendemia told her that he and Mr. Woelfel had already agreed that they wanted her to fill one of the vacancies; gave her most of the questions which were asked during the interview; and told her that she would be promoted to Team Captain as long as she didn't screw up the interview.

33. Mr. Vendemia also told Ms. Royce that she should never tell anyone what he had done, and that if she did tell anyone, he not only would deny it, but that she would be fired as a Team Captain.

34. Ms. Royce believed that Mr. Vendemia would, indeed, make sure that she was fired, and that unless she tolerated his advances and inappropriate communications, she would be punished by being passed over for promotions, being fired, etc.

35. In July 2012, Ms. Royce was promoted to Team Captain of the Philadelphia Office. Mr. Vendemia told her that she was being promoted because of him.

36. Ms. Royce was promoted to Team Captain, made responsible for handling academic and behavioral concerns ("ARB"), and given an office.

37. Ms. Royce began having anxiety attacks and insomnia. She felt physically ill at work, and afraid. Sometimes, she was shaky. She changed from someone who used to spend time "out on the field", interacting with her subordinates and colleagues, to someone who felt the need to lock herself in her office. Even on the weekend, the thought of going to work caused panic attacks.

38. As Mr. Vendemia persisted with his unwelcome attentions, Ms. Royce felt tremendous

stress: she felt overwhelmed, anxious, easily frustrated, and easily irritated. She increased her alcohol consumption in order to deal with the stress, and was absent from work due to illness more often than she had been in the past because of her drinking and anxiety. Her marriage was under increasing strain.

39. Because Mr. Vendemia's sexual harassment continued, on or about August 22, 2012, Ms. Royce met with Eric Woelfel in his office. She reported the sexual harassment by James Vendemia. Among other things, Ms. Royce told Mr. Woelfel that Mr. Vendemia behaved inappropriately in text messages, phone calls, and conversations. Ms. Royce shared that she had reported Mr. Vendemia's behavior to Carla Krochak on two occasions. Ms. Royce told Mr. Woelfel the things that Mr. Vendemia would say and do. At times, Ms. Royce was crying hysterically.

40. Mr. Woelfel asked Ms. Royce if she was "imagining it". Ms. Royce told him "absolutely not", and stated that it was ruining her life. Mr. Woelfel then told Ms. Royce to contact the Human Resources Director, Mimi Wilson. He told Ms. Royce that he was going to contact Human Resources as well and report it.

41. Following Mr. Woelfel's instructions, Ms. Royce sent Ms. Wilson an email later that day informing her of the sexual harassment, and of the fact that she had made two complaints to another supervisor. She also sent Mr. Woelfel an email confirming that she had contacted Human Resources.

42. Despite Ms. Royce's numerous complaints of sexual harassment, PA Cyber failed to take prompt and effective remedial action to address the sexually hostile work environment.

43. Retaliation immediately followed Ms. Royce's complaints of sexual harassment to Mr. Woelfel and Human Resources.

44. After Ms. Royce complained to Mr. Woelfel, Mr. Woelfel removed her from the GAP program. Mr. Woelfel claimed that he was doing this for her own good, because she "obviously wouldn't feel comfortable working with Jim".

45. Ms. Royce did not want to give up her responsibilities for the GAP program. Ms. Royce felt that she was instrumental in the development of the GAP program, was very proud of her work, and enjoyed her work in the program. Days before, Mr. Vendemia told the team that Ms. Royce was his "go to" person and that if he was unavailable at any given time, they should go to her with questions.

-6-

46. Mr. Woelfel then informed Mr. Vendemia that Ms. Royce was no longer going to be part of the program.  Mr. Vendemia then sent an email to the entire GAP team which stated that Ms. Royce was no longer a part of their group, and that all questions should be directed to him.  Ms. Royce felt as though she had been publicly slapped in the face.  She was embarrassed and disappointed.

47. During "team huddles", Mr. Vendemia spoke to Ms. Royce such a way that excluded her.  His physical presence was uncomfortable for her, all the more so when it was so public.

48. Mrs. Renee Vendemia aggressively ripped down everything that Ms. Royce had put on the Community Bulletin Board, and threw the papers on the floor.  Then she and Mr. Vendemia gave each other "high 5's".

49. Later that day, Mr. Vendemia reprimanded Ms. Royce in the presence of Mr. Woelfel and Rebekah Larson, alleging that her community bulletin board was not up to par.

50. On August 24, 2012, Ms. Royce sent Ms. Wilson an email notifying her of the retaliation which James and Renee Vendemia had inflicted on her since she complained of sexual harassment, of her physical and mental suffering; and of a co-worker's willingness to speak with her about what he witnessed.  Ms. Royce asked Ms. Wilson to investigate and offer her relief from the improper work environment.

51. PA Cyber did not provide any relief from the retaliation.  Mr. Woelfel joined Mrs. Vendemia in retaliating against Ms. Royce.

52. Mr. Woelfel began criticizing Ms. Royce's work with the Academic Review Board, verbally and in writing.

53. Starting on or about September 6, 2012, Eric Woelfel scolded Ms. Royce in the presence of Ms. Larson for allegedly handling the ARB process incorrectly.

54. Mrs. Vendemia treated Ms. Royce with hostility in front of others.  Ms. Vendemia stopped saying hello to Ms. Royce.  While in the presence of others, Mrs. Vendemia completely ignored Ms. Royce's attempts at conversation and to get instruction.  Mrs. Vendemia started coming to Ms. Larson's cubicle frequently, speaking so loudly that Ms. Royce was forced to hear the conversation, and telling Ms. Larson how Ms. Vendemia had been praising Ms. Larson to others in the main offices, and that she had been telling administrators or others of importance in the company how great and talented Ms. Larson was.

-7-

55. Mrs. Vendemia's apparent attempts to make Ms. Royce uncomfortable and insecure succeeded. Even Mrs. Vendemia's presence caused Ms. Royce's heart to race, and caused her to be physically uncomfortable to the point where Ms. Royce was unable to work. In order to avoid hearing Mrs. Vendemia's performance, Ms. Royce started to close the door to her office, which shut Ms. Royce off from co-workers even more.

56. Mrs. Vendemia also began to display physical affection toward her husband in front of the staff.

57. Ms. Royce believed that her performance was suffering as a result of the retaliation, and she worried that she would lose her job. Ms. Royce made an appointment with a physician, and was first treated for anxiety/panic attacks on September 11, 2012. Her treatment included office visits, medication and therapy.

58. Ms. Royce questioned whether she would be able to continue working in the Philadelphia office and, on September 12, 2012, informed Ms. Wilson of the constant stress which she was under; stated that she had been ostracized, which made it difficult for her to work at her usual level of efficiency; stated that she had begun medical treatment and had to use PTO because of her high stress level; and asked that she be permitted to work at home, pending the results of the investigation into her sexual harassment complaint.

59. Ms. Royce's request to work at home was approved. She was given a company cell phone. Because the data was online, and because Ms. Royce had access to a Skye-type program, Ms. Royce was able to fulfill her responsibilities while working at home.

60. Ms. Royce worked from home from September 17 - October 19, 2012.

61. The retaliation continued while Ms. Royce worked from home. She was removed from supervising the ARB program: supposedly, she was unable to supervise the program offsite. In fact, Ms. Royce had been supervising the program from home successfully, using both telephone conversations and emails.

62. Management continued to undermine Ms. Royce's authority as a team leader to the point where Ms. Royce's team gradually stopped calling her and emailing her with questions, and instead sought supervision from Mr. Vendemia, Mr. Woelfel and Ms. Larson.

63. On September 9, 2012, Ms. Royce dropped out of the Masters degree program because she had no one to serve as her mentor (Mr. Vendemia had been her mentor), and because she was unable to fulfill the observational hour requirements because she no longer

worked in an administrative position.

64. Almost two months after Ms. Royce reported the sexual harassment to Human Resources, Mimi Wilson told Ms. Royce that the investigation had been completed. Ms. Royce was not told the results of the investigation.

65. In essence, Human Resources recommended that Ms. Royce pay the price of complaining about sexual harassment and retaliation: Human Resources recommended that Ms. Royce be transferred to the Allentown office in a job with different responsibilities but - temporarily - the same pay.

66. Human Resources asked Mr. Vendemia whether he agreed with the recommendation to transfer Ms. Royce, and he did.

67. PA Cyber told Ms. Royce that she did not have a choice as to whether to be transferred.

68. Although Ms. Royce had been able to perform her duties from home, neither Ms. Wilson nor Mr. Woelfel explained why she could not continue working from home.

69. On October 18, 2012, Mr. Woelfel notified Ms. Royce that she would be starting in Allentown on Monday October 22nd and that she would be in charge of the Clicks & Bricks program in Allentown. He acted as though she could create this program from scratch and see it thrive, and that the program would be whatever she made of it.

70. Mr. Woelfel did not accurately describe Ms. Royce's responsibilities and opportunities in Allentown. The transfer was a demotion, in title and duties. Ms. Royce's title was no longer Team Captain; she was called a classroom supervisor. Ms. Royce's duties were those of even lower ranking employees (that is, Instructional Supervisors and Clicks and Bricks Facilitators). Ms. Royce was stripped of her duties as an administrator; she no longer handled academic and behavioral concerns, she no longer ran disciplinary meetings for the academy, and she no longer supervised direct reports. Nor was Ms. Royce in charge of the Clicks and Bricks program in Allentown. She was responsible for all types of data entry for the classroom.

71. Ms. Royce repeatedly asked the head of the Allentown office for more responsibilities. He refused. At times, he told Ms. Royce that she was out of line.

72. Other terms and conditions of Ms. Royce's employment changed in other ways when she was transferred to Allentown. For example, she had worked from 8:00 a.m. until 4:00 p.m. in the Philadelphia office. She was told that, in Allentown, she was expected to

work from 8:00 a.m. until 8:00 p.m. Monday through Friday, as well as on Saturdays.

73. On October 22, 2012, she told Mr. Haas that she viewed the additional hours as a punishment for speaking up.

74. On several occasions, Ms. Royce notified Human Resources about concerns with her new position.

75. It took PA Cyber almost four (4) weeks to respond to Ms. Royce's October 31, 2012 email regarding her concerns. Ms. Royce's concerns were not addressed.

76. Ms. Royce continued to tell Mr. Haas and Mrs. Haas that she believed that her position was taken away because she had spoken up.

77. Ms. Royce's physician recommended that she consider taking leave because of anxiety and panic attacks, and she forwarded completed paperwork to PA Cyber on January 16, 2013.

78. Ms. Royce's application for FMLA leave was approved, and her return to work date was April 9, 2013.

79. On March 7, 2013, Ms. Royce notified PA Cyber that she was not confident about returning to an office setting, and requesting help finding a work-from-home position.

80. PA Cyber replied that no work-at-home positions were available, but said that it would keep her request in mind.

81. PA Cyber never notified Ms. Royce of an opening in a work-at-home position.

82. In fact, at least one position which could be performed at home became available within months of Ms. Royce's request for help finding a work-from-home position.

83. On May 30, 2013, Ms. Royce applied for the position of Attendance Administrator on May 30, 2013.

84. After Ms. Royce applied for the position of Attendance Administrator, PA Cyber decided not to fill the position.

85. On Saturday March 23, 2013, Ms. Royce sent a detailed email to Dr. Conti, PA Cyber's Chief Executive Officer. It informed him that since filing a sexual harassment complaint in August 2012, her work environment had deteriorated to the point where she needed to take leave under the Family and Medical Leave Act.

86. On April 30, 2013, PA Cyber notified Ms. Royce that she was eligible for FMLA, and that her Return to Work date was June 14, 2013.

87. On May 3, 2013, PA Cyber notified Ms. Royce that she did not have any FMLA leave available.

88. On May 7, 2013, Ms. Royce's therapist released her to work for a job which she previously held, or one which is consistent with her skills, provided that she was able to work at home.

89. On May 20, 2013, a copy of the release from Ms. Royce's therapist was delivered to PA Cyber along with an inquiry as to when Ms. Royce would be permitted to return to work.

90. PA Cyber never offered Ms. Royce any position since receiving the release to return to work.

91. PA Cyber fired Ms. Royce as of September 30, 2013.

92. As a result of the sexual harassment and retaliation, Ms. Royce lost wages and benefits, experienced emotional pain and suffering, needed to retain counsel, incurred expenses, and was otherwise damaged.

93. On April 2, 2013, Ms. Royce traveled to the offices of the U.S. Equal Employment Opportunity Commission ("E.E.O.C.") and signed a Charge of Discrimination against PA Cyber which alleged that she had been discriminated against on the basis of sex and retaliation.

94. The E.E.O.C. assigned charge number Charge No. 530-2013-01783 to Ms. Royce's charge.

95. On March 11, 2015, the E.E.O.C. mailed Ms. Royce a Notice of Right to Sue.

96. Ms. Royce received the E.E.O.C.'s Notice of Right to Sue on March 14, 2015.

97. This lawsuit has been filed within ninety (90) days of Ms. Royce's receipt of the E.E.O.C.'s Notice of Right to Sue.

## VI.   CLAIMS

### FIRST COUNT
### (Violation of Title VII of the Civil Rights Act of 1964)

98. Paragraphs 1 through 97 are incorporated by reference.

99. Ms. Royce suffered intentional discrimination because of her sex (female).

100.   The discrimination against Ms. Royce was severe and/or pervasive.

-11-

101. The discrimination detrimentally affected Ms. Royce.

102. The discrimination would detrimentally affect a reasonable person of the same gender (female).

103. Mr. Vendemia was Ms. Royce's supervisor.

104. PA Cyber had a duty to promptly and thoroughly investigate Ms. Royce's allegations.

105. PA Cyber failed to promptly and thoroughly investigate Ms. Royce's allegations.

106. PA Cyber had a duty to take immediate and appropriate corrective action by doing whatever is necessary to end the harassment, make the victim whole by restoring lost employment benefits or opportunities to her, and prevent the misconduct from recurring.

107. PA Cyber did not take immediate and appropriate corrective action.

108. As a practical matter, it was Ms. Royce rather than Mr. Vendemia who was disciplined as a result of his illegal treatment of her.

109. Mr. Vendemia was not disciplined for his inappropriate treatment of Ms. Royce.

110. PA Cyber is liable for Mr. Vendemia's sexual harassment of Ms. Royce, and for the damages caused by his sexual harassment of her.

WHEREFORE Ms. Royce prays for compensatory damages (*e.g.,* pecuniary losses, physical and emotional pain, suffering, inconvenience, mental anguish, and other nonpecuniary losses), back wages and benefits, front pay and benefits, punitive damages, attorney's fees, costs, and such other and further relief as are permitted by law or equity.

## SECOND COUNT
### (Violation of Title VII of the Civil Rights Act of 1964 (Retaliation))

111. Paragraphs 1 through 97 are incorporated by reference.

112. Ms. Royce engaged in an activity protected by Title VII when she complained of Mr. Vendemia's sexual harassment to her immediate supervisor, Mr. Woelfel, and Human Resources.

113. It is illegal to fire, demote, harass, or otherwise "retaliate" against employees because they complained to their employer about discrimination on the job.

114. Mr. Vendemia, Ms. Vendemia, Mr. Woelfel, Human Resources and others retaliated against Ms. Royce because she complained about Mr. Vendemia's sexual harassment

-12-

of her.

WHEREFORE Ms. Royce prays for compensatory damages (*e.g.,* pecuniary losses, physical and emotional pain, suffering, inconvenience, mental anguish, and other nonpecuniary losses), back wages and benefits, front pay and benefits, punitive damages, attorney's fees, costs, and such other and further relief as are permitted by law or equity.

Jana R. Barnett, Esquire
Attorney for Plaintiff
Supreme Court of Pa. I.D. 73189
Law Offices of Jana R. Barnett
1238 Cleveland Avenue
Wyomissing, PA  19610-2102
P: 610/478-1860
F: 610/478-0453
C: 484/332-4002
JRB@JanaRBarnettEsq.com

Dated: June 6, 2015

## JURY TRIAL DEMAND

Ms. Royce demands a trial by jury as to all issues.

Jana R. Barnett, Esquire
Attorney for Plaintiff

Dated: June 6, 2015

-13-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Vanessa Royce** | : | **Civil Action** |
| **638 Charles Drive** | : | |
| **Gilbertsville, PA 19525,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **No. 15-_____** |
| ***v.*** | : | |
| | : | **Assigned to: _____** |
| **The Pennsylvania Cyber Charter School,** | : | |
| **652 Midland Avenue** | : | |
| **Midland, PA 15059,** | : | |
| | : | |
| **Defendant** | : | **Jury Trial Demanded** |

**COMPLAINT**

Vanessa Royce, Plaintiff, by her attorney, Jana R. Barnett, Esq., alleges as follows:

## I.    INTRODUCTION

1.  This is an action seeking redress for discrimination based on sex (sexual harassment) and retaliation, in contravention of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e, *et seq.*

2.  Vanessa Royce, a female citizen of the United States, seeks equitable and monetary relief for the unlawful actions of The Pennsylvania Cyber Charter School, including back pay and benefits, front pay and benefits, compensation for physical and emotional pain and suffering, reimbursement of expenses, costs, attorney's fees, punitive damages, and all other relief to which she is entitled by law.

## II.   JURISDICTION AND VENUE

3.  This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. §1331, and 42 U.S.C. §2000e *et seq.* (§706).

4.  Venue in this district is appropriate pursuant to 28 U.S.C. §1391(b).  The unlawful acts and practices of The Pennsylvania Cyber Charter School were committed by the

Defendant within the Eastern District of Pennsylvania, primarily in its offices in Philadelphia and Lehigh Counties.

III.   **PARTIES**

5.   Plaintiff Vanessa Royce is an adult citizen of the Commonwealth of Pennsylvania who resides in Montgomery County, Pennsylvania.  Her address is 638 Charles Drive, Gilbertsville, PA 19525.

6.   Defendant The Pennsylvania Cyber Charter School ("PA Cyber") is headquartered at 652 Midland Avenue, Midland, PA 15059.  It employed Ms. Royce.  It has offices in Lehigh and Philadelphia Counties, and Ms. Royce worked in both of those offices.  It is an employer within the meaning of Title VII.

IV.   **FACTUAL BACKGROUND**

7.   Ms. Royce began working for PA Cyber as a substitute teacher on or about February 15, 2010.

8.   In or about March 2010, Ms. Royce because a fulltime Instructional Supervisor in the Philadelphia office.

9.   In or around January 2012, PA Cyber transferred James Vendemia and his wife, Renee, to its Philadelphia Office.  Mr. Vendemia was the Principal, Eastern Support Center.  His wife was an Instructional Supervisor.

10.   PA Cyber knew that Mr. Vendemia had engaged in inappropriate conduct while working for PA Cyber and before his transfer to the Philadelphia Office.

11.   Ms. Royce reported to Mr. Vendemia from approximately January 2012 through October 15, 2012.

12.   As the Principal, Mr. Vendemia was responsible for the entire Philadelphia office. Among other things, Mr. Vendemia participated in all of the employee performance reviews; helped to create employee improvement plans; decided when staff could take time off; and reprimanded staff whom he perceived as having too many students with academic or behavioral concerns.

13.   Mr. Vendemia reported to Academy Leader Eric Woelfel.

14.   Mr. Vendemia took a particular interest in Ms. Royce soon after he began working in

Philadelphia, and asked her to work with him, more and more.

15. PA Cyber's Policy 703 required that, "Any and all complaints of harassment shall be immediately reported to the immediate supervisor or to Human Resources without fear of reprisal."

16. In January 2012, Ms. Royce complained about Mr. Vendemia's behavior toward her to her immediate supervisor, Carla Krochak (Team Captain / Instructional Supervisor).  Ms. Royce notified Ms. Krochak that she felt that Mr. Vendemia was paying extra attention to her, and that his demeanor and approach made her uncomfortable.  Ms. Royce described it as a "weird feeling".

17. Beginning in February 2012, Mr. Vendemia initiated inappropriate communications with Ms. Royce at least once or twice a week.  His communications were conversations in person and on the telephone, as well as text messages and emails.  He would communicate with her before, during, and after, normal work hours.  Mr. Vendemia commented on Ms. Royce's appearance.  He stated how lucky her husband was to be with her.  He interrupted her time with her husband, calling her from bars in the evenings, and telling her that he was out "getting toasted" with friends.  He would tell Ms. Royce that he had left his wife at home.

18. His inappropriate behavior and communications became more frequent.

19. Because Mr. Vendemia commented on Ms. Royce's appearance so often, Ms. Royce felt that Mr. Vendemia took an interest in her, and was "helping" her, because he was physically attracted to her.  Mr. Vendemia seemed to undress her with his eyes.  He positioned himself so that he was close to her, physically.  He made eye contact with her more often than with other employees.

20. Mr. Vendemia's attentions to Ms. Royce were so noticeable that coworkers called Ms. Royce Mr. Vendemia's "pet".

21. Mr. Vendemia's comments about Ms. Royce's clothing and appearance did not serve any business purpose.  They had the effect of making her feel self-conscious and concerned that Mr. Vendemia would make more explicit sexual advances.  His comments made her feel like an object.  She felt uncomfortable in her clothing, as though she were naked.  Ms. Royce wondered whether Mr. Vendemia was looking at the shirt, or looking through it and imagining what was underneath.  Ms. Royce felt as though she were under a

microscope.

22. Ms. Royce changed her style of work clothing in the hopes that the unwanted attention from Mr. Vendemia would cease.

23. Mr. Vendemia's comments interfered with Ms. Royce's ability to perform her job. Among other things, she changed from a "walk-around manager" to someone who hid in her office. She became more subdued in her communications with her staff.

24. Mr. Vendemia's comments about her clothing and appearance, his interest in her, his telephone calls to her home, his undressing her with his eyes, his eye contact, etc. were unwelcome.

25. During the week of February 22, 2012, Ms. Royce made a second complaint about Mr. Vendemia to her immediate supervisor. Ms. Royce informed Ms. Krochak that Mr. Vendemia sent her inappropriate text messages, that he spoke to her in inappropriate ways, that he had been contacting her outside of normal work hours on many occasions, and that she was uncomfortable with his attentions. Ms. Royce also informed Ms. Krochak that her husband was very upset and that their marriage was suffering. Ms. Royce told Ms. Krochak that she felt overwhelmed by the amount of work that Mr. Vendemia wanted her to do, but believed that she had to do it or would face repercussions.

26. On February 25, 2012, Ms. Krochak sent Ms. Royce an email confirming that Ms. Royce had shared information with her, that she had documented the conversation, and that Ms. Krochak had advised Ms. Royce to go to Human Resources.

27. Ms. Krochak did not report the sexual harassment to Human Resources or PA Cyber's management.

28. Although Ms. Royce did not use words to tell Mr. Vendemia that his attentions were unwelcome, she communicated this message to him in a variety of ways, including changing her interactions with him. Ms. Royce steered clear of Mr. Vendemia. She sat as far away from him as possible when they were in the same room. She tried to look busy. She remained on the telephone longer than necessary to avoid being called into meetings. Her facial expressions and body language indicated that she wanted to be as far away from him as possible.

29. Ms. Royce told colleagues that Mr. Vendemia's attentions were unwanted. She showed

some of Mr. Vendemia's text messages to a male co-worker, and told the co-worker that the messages made her uncomfortable.  The co-worker replied by saying that he didn't believe that speaking up would help.

30. A female co-worker told Ms. Royce that she also had been receiving text messages and after-hours telephone calls from Mr. Vendemia; and that Mr. Vendemia's text messages and after-hours calls made her feel uncomfortable, but that she didn't feel she could do anything to stop it because Mr. Vendemia was her boss.

31. Mr. Vendemia sent Ms. Royce text messages and emails telling her to "stick with him" or "stick with him and [she'd] go places".

32. Demonstrating his power to help Ms. Royce, Mr. Vendemia and Academy Leader Eric Woelfel gave Ms. Royce a "heads up" that the position of Team Captain would be opening up.  Mr. Vendemia told her that he and Mr. Woelfel had already agreed that they wanted her to fill one of the vacancies; gave her most of the questions which were asked during the interview; and told her that she would be promoted to Team Captain as long as she didn't screw up the interview.

33. Mr. Vendemia also told Ms. Royce that she should never tell anyone what he had done, and that if she did tell anyone, he not only would deny it, but that she would be fired as a Team Captain.

34. Ms. Royce believed that Mr. Vendemia would, indeed, make sure that she was fired, and that unless she tolerated his advances and inappropriate communications, she would be punished by being passed over for promotions, being fired, etc.

35. In July 2012, Ms. Royce was promoted to Team Captain of the Philadelphia Office.  Mr. Vendemia told her that she was being promoted because of him.

36. Ms. Royce was promoted to Team Captain, made responsible for handling academic and behavioral concerns ("ARB"), and given an office.

37.  Ms. Royce began having anxiety attacks and insomnia.  She felt physically ill at work, and afraid.  Sometimes, she was shaky.  She changed from someone who used to spend time "out on the field", interacting with her subordinates and colleagues, to someone who felt the need to lock herself in her office.  Even on the weekend, the thought of going to work caused panic attacks.

38. As Mr. Vendemia persisted with his unwelcome attentions, Ms. Royce felt tremendous

stress: she felt overwhelmed, anxious, easily frustrated, and easily irritated.  She increased her alcohol consumption in order to deal with the stress, and was absent from work due to illness more often than she had been in the past because of her drinking and anxiety.  Her marriage was under increasing strain.

39. Because Mr. Vendemia's sexual harassment continued, on or about August 22, 2012, Ms. Royce met with Eric Woelfel in his office.  She reported the sexual harassment by James Vendemia.  Among other things, Ms. Royce told Mr. Woelfel that Mr. Vendemia behaved inappropriately in text messages, phone calls, and conversations.  Ms. Royce shared that she had reported Mr. Vendemia's behavior to Carla Krochak on two occasions.  Ms. Royce told Mr. Woelfel the things that Mr. Vendemia would say and do. At times, Ms. Royce was crying hysterically.

40. Mr. Woelfel asked Ms. Royce if she was "imagining it".  Ms. Royce told him "absolutely not", and stated that it was ruining her life.  Mr. Woelfel then told Ms. Royce to contact the Human Resources Director, Mimi Wilson.  He told Ms. Royce that he was going to contact Human Resources as well and report it.

41. Following Mr. Woelfel's instructions, Ms. Royce sent Ms. Wilson an email later that day informing her of the sexual harassment, and of the fact that she had made two complaints to another supervisor.  She also sent Mr. Woelfel an email confirming that she had contacted Human Resources.

42. Despite Ms. Royce's numerous complaints of sexual harassment, PA Cyber failed to take prompt and effective remedial action to address the sexually hostile work environment.

43. Retaliation immediately followed Ms. Royce's complaints of sexual harassment to Mr. Woelfel and Human Resources.

44. After Ms. Royce complained to Mr. Woelfel, Mr. Woelfel removed her from the GAP program.  Mr. Woelfel claimed that he was doing this for her own good, because she "obviously wouldn't feel comfortable working with Jim".

45. Ms. Royce did not want to give up her responsibilities for the GAP program.  Ms. Royce felt that she was instrumental in the development of the GAP program, was very proud of her work, and enjoyed her work in the program.  Days before, Mr. Vendemia told the team that Ms. Royce was his "go to" person and that if he was unavailable at any given time, they should go to her with questions.

46. Mr. Woelfel then informed Mr. Vendemia that Ms. Royce was no longer going to be part of the program.  Mr. Vendemia then sent an email to the entire GAP team which stated that Ms. Royce was no longer a part of their group, and that all questions should be directed to him.  Ms. Royce felt as though she had been publicly slapped in the face.  She was embarrassed and disappointed.

47. During "team huddles", Mr. Vendemia spoke to Ms. Royce such a way that excluded her.  His physical presence was uncomfortable for her, all the more so when it was so public.

48. Mrs. Renee Vendemia aggressively ripped down everything that Ms. Royce had put on the Community Bulletin Board, and threw the papers on the floor.  Then she and Mr. Vendemia gave each other "high 5's".

49. Later that day, Mr. Vendemia reprimanded Ms. Royce in the presence of Mr. Woelfel and Rebekah Larson, alleging that her community bulletin board was not up to par.

50. On August 24, 2012, Ms. Royce sent Ms. Wilson an email notifying her of the retaliation which James and Renee Vendemia had inflicted on her since she complained of sexual harassment, of her physical and mental suffering; and of a co-worker's willingness to speak with her about what he witnessed.  Ms. Royce asked Ms. Wilson to investigate and offer her relief from the improper work environment.

51. PA Cyber did not provide any relief from the retaliation.  Mr. Woelfel joined Mrs. Vendemia in retaliating against Ms. Royce.

52. Mr. Woelfel began criticizing Ms. Royce's work with the Academic Review Board, verbally and in writing.

53. Starting on or about September 6, 2012, Eric Woelfel scolded Ms. Royce in the presence of Ms. Larson for allegedly handling the ARB process incorrectly.

54. Mrs. Vendemia treated Ms. Royce with hostility in front of others.  Ms. Vendemia stopped saying hello to Ms. Royce.  While in the presence of others, Mrs. Vendemia completely ignored Ms. Royce's attempts at conversation and to get instruction.  Mrs. Vendemia started coming to Ms. Larson's cubicle frequently, speaking so loudly that Ms. Royce was forced to hear the conversation, and telling Ms. Larson how Ms. Vendemia had been praising Ms. Larson to others in the main offices, and that she had been telling administrators or others of importance in the company how great and talented Ms. Larson was.

55. Mrs. Vendemia's apparent attempts to make Ms. Royce uncomfortable and insecure succeeded. Even Mrs. Vendemia's presence caused Ms. Royce's heart to race, and caused her to be physically uncomfortable to the point where Ms. Royce was unable to work. In order to avoid hearing Mrs. Vendemia's performance, Ms. Royce started to close the door to her office, which shut Ms. Royce off from co-workers even more.

56. Mrs. Vendemia also began to display physical affection toward her husband in front of the staff.

57. Ms. Royce believed that her performance was suffering as a result of the retaliation, and she worried that she would lose her job. Ms. Royce made an appointment with a physician, and was first treated for anxiety/panic attacks on September 11, 2012. Her treatment included office visits, medication and therapy.

58. Ms. Royce questioned whether she would be able to continue working in the Philadelphia office and, on September 12, 2012, informed Ms. Wilson of the constant stress which she was under; stated that she had been ostracized, which made it difficult for her to work at her usual level of efficiency; stated that she had begun medical treatment and had to use PTO because of her high stress level; and asked that she be permitted to work at home, pending the results of the investigation into her sexual harassment complaint.

59. Ms. Royce's request to work at home was approved. She was given a company cell phone. Because the data was online, and because Ms. Royce had access to a Skye-type program, Ms. Royce was able to fulfill her responsibilities while working at home.

60. Ms. Royce worked from home from September 17 - October 19, 2012.

61. The retaliation continued while Ms. Royce worked from home. She was removed from supervising the ARB program: supposedly, she was unable to supervise the program offsite. In fact, Ms. Royce had been supervising the program from home successfully, using both telephone conversations and emails.

62. Management continued to undermine Ms. Royce's authority as a team leader to the point where Ms. Royce's team gradually stopped calling her and emailing her with questions, and instead sought supervision from Mr. Vendemia, Mr. Woelfel and Ms. Larson.

63. On September 9, 2012, Ms. Royce dropped out of the Masters degree program because she had no one to serve as her mentor (Mr. Vendemia had been her mentor), and because she was unable to fulfill the observational hour requirements because she no longer

-8-

worked in an administrative position.

64. Almost two months after Ms. Royce reported the sexual harassment to Human Resources, Mimi Wilson told Ms. Royce that the investigation had been completed. Ms. Royce was not told the results of the investigation.

65. In essence, Human Resources recommended that Ms. Royce pay the price of complaining about sexual harassment and retaliation: Human Resources recommended that Ms. Royce be transferred to the Allentown office in a job with different responsibilities but - temporarily - the same pay.

66. Human Resources asked Mr. Vendemia whether he agreed with the recommendation to transfer Ms. Royce, and he did.

67. PA Cyber told Ms. Royce that she did not have a choice as to whether to be transferred.

68. Although Ms. Royce had been able to perform her duties from home, neither Ms. Wilson nor Mr. Woelfel explained why she could not continue working from home.

69. On October 18, 2012, Mr. Woelfel notified Ms. Royce that she would be starting in Allentown on Monday October 22nd and that she would be in charge of the Clicks & Bricks program in Allentown.  He acted as though she could create this program from scratch and see it thrive, and that the program would be whatever she made of it.

70. Mr. Woelfel did not accurately describe Ms. Royce's responsibilities and opportunities in Allentown.  The transfer was a demotion, in title and duties.  Ms. Royce's title was no longer Team Captain; she was called a classroom supervisor.  Ms. Royce's duties were those of even lower ranking employees (that is, Instructional Supervisors and Clicks and Bricks Facilitators).  Ms. Royce was stripped of her duties as an administrator; she no longer handled academic and behavioral concerns, she no longer ran disciplinary meetings for the academy, and she no longer supervised direct reports.  Nor was Ms. Royce in charge of the Clicks and Bricks program in Allentown.  She was responsible for all types of data entry for the classroom.

71. Ms. Royce repeatedly asked the head of the Allentown office for more responsibilities. He refused.  At times, he told Ms. Royce that she was out of line.

72. Other terms and conditions of Ms. Royce's employment changed in other ways when she was transferred to Allentown.  For example, she had worked from 8:00 a.m. until 4:00 p.m. in the Philadelphia office.  She was told that, in Allentown, she was expected to

work from 8:00 a.m. until 8:00 p.m. Monday through Friday, as well as on Saturdays.

73. On October 22, 2012, she told Mr. Haas that she viewed the additional hours as a punishment for speaking up.

74. On several occasions, Ms. Royce notified Human Resources about concerns with her new position.

75. It took PA Cyber almost four (4) weeks to respond to Ms. Royce's October 31, 2012 email regarding her concerns.  Ms. Royce's concerns were not addressed.

76. Ms. Royce continued to tell Mr. Haas and Mrs. Haas that she believed that her position was taken away because she had spoken up.

77. Ms. Royce's physician recommended that she consider taking leave because of anxiety and panic attacks, and she forwarded completed paperwork to PA Cyber on January 16, 2013.

78. Ms. Royce's application for FMLA leave was approved, and her return to work date was April 9, 2013.

79. On March 7, 2013, Ms. Royce notified PA Cyber that she was not confident about returning to an office setting, and requesting help finding a work-from-home position.

80. PA Cyber replied that no work-at-home positions were available, but said that it would keep her request in mind.

81. PA Cyber never notified Ms. Royce of an opening in a work-at-home position.

82. In fact, at least one position which could be performed at home became available within months of Ms. Royce's request for help finding a work-from-home position.

83. On May 30, 2013, Ms. Royce applied for the position of Attendance Administrator on May 30, 2013.

84. After Ms. Royce applied for the position of Attendance Administrator, PA Cyber decided not to fill the position.

85. On Saturday March 23, 2013, Ms. Royce sent a detailed email to Dr. Conti, PA Cyber's Chief Executive Officer.  It informed him that since filing a  sexual harassment complaint in August 2012, her work environment had deteriorated to the point where she needed to take leave under the Family and Medical Leave Act.

86. On April 30, 2013, PA Cyber notified Ms. Royce that she was eligible for FMLA, and that her Return to Work date was June 14, 2013.

87. On May 3, 2013, PA Cyber notified Ms. Royce that she did not have any FMLA leave available.

88. On May 7, 2013, Ms. Royce's therapist released her to work for a job which she previously held, or one which is consistent with her skills, provided that she was able to work at home.

89. On May 20, 2013, a copy of the release from Ms. Royce's therapist was delivered to PA Cyber along with an inquiry as to when Ms. Royce would be permitted to return to work.

90. PA Cyber never offered Ms. Royce any position since receiving the release to return to work.

91. PA Cyber fired Ms. Royce as of September 30, 2013.

92. As a result of the sexual harassment and retaliation, Ms. Royce lost wages and benefits, experienced emotional pain and suffering, needed to retain counsel, incurred expenses, and was otherwise damaged.

93. On April 2, 2013, Ms. Royce traveled to the offices of the U.S. Equal Employment Opportunity Commission ("E.E.O.C.") and signed a Charge of Discrimination against PA Cyber which alleged that she had been discriminated against on the basis of sex and retaliation.

94. The E.E.O.C. assigned charge number Charge No. 530-2013-01783 to Ms. Royce's charge.

95. On March 11, 2015, the E.E.O.C. mailed Ms. Royce a Notice of Right to Sue.

96. Ms. Royce received the E.E.O.C.'s Notice of Right to Sue on March 14, 2015.

97. This lawsuit has been filed within ninety (90) days of Ms. Royce's receipt of the E.E.O.C.'s Notice of Right to Sue.


## VI.    CLAIMS

### FIRST COUNT
### (Violation of Title VII of the Civil Rights Act of 1964)

98. Paragraphs 1 through 97 are incorporated by reference.

99. Ms. Royce suffered intentional discrimination because of her sex (female).

100.    The discrimination against Ms. Royce was severe and/or pervasive.

-11-

101.   The discrimination detrimentally affected Ms. Royce.

102.   The discrimination would detrimentally affect a reasonable person of the same gender (female).

103.   Mr. Vendemia was Ms. Royce's supervisor.

104.   PA Cyber had a duty to promptly and thoroughly investigate Ms. Royce's allegations.

105.   PA Cyber failed to promptly and thoroughly investigate Ms. Royce's allegations.

106.   PA Cyber had a duty to take immediate and appropriate corrective action by doing whatever is necessary to end the harassment, make the victim whole by restoring lost employment benefits or opportunities to her, and prevent the misconduct from recurring.

107.   PA Cyber did not take immediate and appropriate corrective action.

108.   As a practical matter, it was Ms. Royce rather than Mr. Vendemia who was disciplined as a result of his illegal treatment of her.

109.   Mr. Vendemia was not disciplined for his inappropriate treatment of Ms. Royce.

110.   PA Cyber is liable for Mr. Vendemia's sexual harassment of Ms. Royce, and for the damages caused by his sexual harassment of her.

WHEREFORE Ms. Royce prays for compensatory damages (*e.g.,* pecuniary losses, physical and emotional pain, suffering, inconvenience, mental anguish, and other nonpecuniary losses), back wages and benefits, front pay and benefits, punitive damages, attorney's fees, costs, and such other and further relief as are permitted by law or equity.

### SECOND COUNT
### (Violation of Title VII of the Civil Rights Act of 1964 (Retaliation))

111.   Paragraphs 1 through 97 are incorporated by reference.

112.   Ms. Royce engaged in an activity protected by Title VII when she complained of Mr. Vendemia's sexual harassment to her immediate supervisor, Mr. Woelfel, and Human Resources.

113.   It is illegal to fire, demote, harass, or otherwise "retaliate" against employees because they complained to their employer about discrimination on the job.

114.   Mr. Vendemia, Ms. Vendemia, Mr. Woelfel, Human Resources and others retaliated against Ms. Royce because she complained about Mr. Vendemia's sexual harassment

of her.

WHEREFORE Ms. Royce prays for compensatory damages (*e.g.,* pecuniary losses, physical and emotional pain, suffering, inconvenience, mental anguish, and other nonpecuniary losses), back wages and benefits, front pay and benefits, punitive damages, attorney's fees, costs, and such other and further relief as are permitted by law or equity.

*Jana R. Barnett* (jrb185)

_____

Jana R. Barnett, Esquire
Attorney for Plaintiff
Supreme Court of Pa. I.D. 73189
Law Offices of Jana R. Barnett
1238 Cleveland Avenue
Wyomissing, PA  19610-2102
P: 610/478-1860
F: 610/478-0453
C: 484/332-4002
JRB@JanaRBarnettEsq.com

Dated: June 6, 2015

## JURY TRIAL DEMAND

Ms. Royce demands a trial by jury as to all issues.

*Jana R. Barnett* (jrb185)

_____

Jana R. Barnett, Esquire

Attorney for Plaintiff

Dated: June 6, 2015